**Daniel DUDLEY, Plaintiff,**

v.

**Robert EDEN, et al., Defendants.**

**No. 1:98CV0607.**

United States District Court,
N.D. Ohio,
Eastern Division.

May 4, 1999.

John W. Ours, Meyers, Hentemann & Rea, Cleveland, OH, Albert L. Purola, Mentor, OH, for plaintiff.

Vincent A. Feudo, John D. Sayre, Nicola, Gudbranson & Cooper, Cleveland, OH, for defendants.

### MEMORANDUM AND ORDER

ALDRICH, District Judge.

Plaintiff Daniel Dudley sued the City of Eastlake and four of its police officers under 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights during the course of an arrest. The claims for excessive force and deliberate indifference to Dudley's medical needs were brought against officers Robert Eden, Theodore Kroczak, William Lewis, and Thomas Angelo, in both their individual and official capacities. Dudley also asserted state law claims for assault, battery, and infliction of emotional distress. Dudley has filed a motion for partial summary judgment (doc. # 16). The defendants collectively oppose Dudley's motion and, in turn, have filed a motion for summary judgment with respect to all of Dudley's federal claims (doc. # 21). For the reasons that follow, this Court denies Dudley's motion for partial summary judgment, grants the defendants' motion, and declines to exercise supplemental jurisdiction over the remaining state law claims.

### I.

The facts of this case, viewed in a light most favorable to Dudley, are essentially undisputed. On April 5, 1996, Dudley decided "to commit suicide by way of police intervention." His plan was to rob a bank, wait for the police, and then get shot by officers arriving at the scene. At approximately 4:30 p.m., an unarmed Dudley entered the Bank One Branch in Eastlake, Ohio, and asked a teller to give him money. The teller surrendered some money to

him. Dudley left the bank, drove his vehicle to the back of a nearby establishment,[1] and waited for the police to arrive.

At approximately 4:34 p.m., Chris Palmer from Bank One telephoned the Eastlake Police Department and informed them that the bank had just been robbed. Palmer indicated that the perpetrator was a white male who had left the premises in a green BMW and driven to the lot behind Manny's Bar. The dispatcher asked Palmer whether the suspect had used any weapons, and Palmer responded that he had not. The dispatcher broadcasted this information and instructed available officers to respond to the scene.

Officer Lewis hurried to Manny's Bar, spotted the green vehicle, and exited his cruiser. As Lewis approached with his gun drawn, Dudley turned his car so that it faced west, towards Handy Rents, the business next to Manny's Bar. Lewis ordered Dudley to exit the car, but Dudley failed to respond. Officers Kroczak and Angelo also arrived on the scene and, with their weapons drawn, helped surround Dudley's vehicle.

Meanwhile, a Handy Rents employee named Michael Pasquale, who was outside loading boxes, heard the yelling. He told his co-worker, Jeremy Petrolewicz, to investigate the situation with him. At approximately the same time, Officer Eden drove his cruiser into the driveway alongside Manny's Bar and saw Lewis standing by Dudley's vehicle. Lewis and Kroczak tried to open Dudley's car doors, but they were locked. Lewis reached his hand inside the partially-open driver's side window, and, as he was about to grasp the lock, Dudley accelerated and took off. Pasquale, who testified in his deposition that he "felt [the car] was coming right at [him]," ran back into Handy Rents, afraid for his safety. According to Pasquale, Dudley drove out of the area at an inordi-

---

1. The vehicle that Dudley drove that day had been stolen. This fact is not material to the constitutional claims involved in this lawsuit; the phrase "his vehicle" is merely used for the sake of convenience.

nately high speed. Pasquale heard an officer shout, "Get his tire!" The officers who were pursuing Dudley on foot shot at his tires and managed to hit at least one of the tires. Pasquale witnessed this attempt to stop Dudley's vehicle through the front window of Handy Rents.

At least two other civilians witnessed what happened next. Vernon Pacholke, an employee of H & H Cycle located across the street from Handy Rents, was at the front door of his business when he heard what he believed to be gun shots. Pacholke saw the green vehicle pull out of the parking lot and turn right onto the four-lane street. According to Pacholke, the vehicle appeared to be out of control. The driver traversed both westbound lanes and crossed the double-yellow line before ending up on the proper side of the street. Karleen Schinke, who was in a car with her husband and two children, saw Dudley's vehicle "flying out" of the Handy Rents parking lot. The Schinkes were waiting to enter the road from their sidestreet. Karleen Schinke saw Officer Eden turn his cruiser around in the parking lot and chase after Dudley. Eden had seen Dudley accelerate out of the back lot, had heard shots being fired, and had proceeded to the front lot of Handy Rents.[2]

According to Dudley, he was immediately "obstructed" by a car in front of him after he pulled out onto the street. He drove over the double-yellow line to "get around" that car. Eden managed to enter the curb lane alongside Dudley, who was in the passing lane. The two men headed west towards Route 91. Within seconds, Eden attempted to cut Dudley off and the two cars collided. As the cars slowed down, Eden (whose vehicle was slightly ahead of and to the right of Dudley's vehicle) fired three rounds out of his driver's side window and into Dudley's windshield. According to the radio broadcast, less than

four minutes had elapsed from the time of the dispatch until the time that Dudley was shot.

The officers who were on foot quickly reached Dudley's vehicle. Kroczak opened the car door and pulled Dudley from the car. Dudley was conscious, although it was not immediately apparent where he had been shot. The officers threw Dudley on the ground, with his chest side facing down. Lewis and Kroczak each placed a knee on Dudley's right and left shoulders, respectively, and grabbed his arms. Angelo, who had in the meantime put Dudley's rolling vehicle in park, gave his handcuffs to Lewis. Lewis and Kroczak handcuffed Dudley and rolled him onto his back. They searched him for weapons and the money stolen from the bank. No weapons were found, but the money was recovered.

Within minutes, paramedics from the Eastlake Fire Department arrived on the scene. Firefighter Mark Walker noticed that no obvious injuries were visible. The officers indicated that based on the casing that was stuck to the outside of Dudley's coat, he must have been shot in the right arm. Walker asked if Dudley's handcuffs could be removed, but Angelo refused the request. After determining that Dudley was breathing and alert, Walker cut away Dudley's clothes to expose the gunshot wound on his shoulder. Dudley was transported to a hospital, where his handcuffs were removed and he received medical treatment.

Blood testing revealed that Dudley had a blood alcohol content of .30 when he was admitted. Dudley was hospitalized for two days, being detoxified and undergoing surgery for the gunshot wound. He ultimately pled guilty to second degree robbery and was sentenced to 7–15 years of incarceration. This lawsuit followed.

---

**2.** Presumably, Eden also heard what was broadcast over the radio dispatch. The phrases, "he's taking off," "northwest corner," and "bring the car around" can be heard on the tape that the defendants submitted in support of their motion for summary judgment.

## II.

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to demonstrate the existence of a material dispute as provided in Rule 56(e):

.... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Parties opposing summary judgment must go beyond the pleadings and produce some type of evidentiary material in support of their position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

In determining whether a genuine issue of material fact exists, this Court must view the evidence in a light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Determination of whether an issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide whether the evidence is such that "reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law." *Id.* at 252, 106 S.Ct. 2505.

## III.

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To establish a cause of action under § 1983, Dudley must show that (1) a person acting under color of state law (2) deprived him of a right secured by the Constitution or other federal laws. *See Foy v. City of Berea*, 58 F.3d 227, 229 (6th Cir.1995).

There is no dispute that Eden, Kroczak, Lewis, and Angelo acted under color of state law when they apprehended Dudley. The parties disagree, however, over whether the defendants deprived Dudley of his constitutional rights. This Court first considers the federal claims against the officers in their individual capacities, treating each constitutional claim in turn.

**A. Fourth Amendment Claim against Eden.** Dudley claims that Eden violated his right to be free from unreasonable seizures under the Fourth Amendment, which has been applied to the states through the Fourteenth Amendment. Apprehension of a suspect by the use of deadly force "is a seizure subject to the reasonableness requirement of the Fourth

Amendment." *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The United States Supreme Court has held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* at 11, 105 S.Ct. 1694. In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the high Court further explained that the reasonableness test under the Fourth Amendment is an objective one, and "must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight." *Id.* at 396, 109 S.Ct. 1865. Courts should bear in mind that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

The Sixth Circuit has summarized the above-quoted passage in *Graham* as follows:

> [W]e must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland,* 954 F.2d 343 (6th Cir.), *cert. denied,* 504 U.S. 915, 112 S.Ct. 1954, 118 L.Ed.2d 557 (1992). The *Smith* case, which binds this Court, is similar to the case at bar. After running a stop sign, Smith tried to escape from a police officer who had attempted to pull him over. Smith led the police on a dangerous high-speed chase, and, after trying to evade the officer on a dead-end street, Smith was shot at and killed by the officer. The Sixth Circuit held that the officer's actions were reasonable as a matter of law. *See id,* at 347–48. Although Smith was unarmed, "he was not harmless; a car can be a deadly weapon." *Id.* at 347 (citation omitted).

■ Under the reasoning of *Smith* and *Garner,* Dudley has failed to show that Eden acted unreasonably when he shot at Dudley's vehicle. In the four minutes leading up to the shooting, officers learned that Dudley had robbed a bank, and they attempted to arrest him from his stopped vehicle. Dudley fled the scene, creating danger for pedestrians and motorists alike. Although an officer in Eden's situation would have heard via the dispatch that no weapons were used during the robbery, he also would have heard shots being fired as Dudley made his escape. Dudley drove into the street at an inordinately high speed, crossed the double-yellow line to avoid a driver who was "obstructing" his way, and otherwise appeared to be escaping towards a major thoroughfare. When Eden's car collided with Dudley's vehicle, there was no way for Eden to be sure that Dudley was either unarmed or non-dangerous. The undisputed facts of this case demonstrate that Eden acted reasonably;[3]

**3.** Dudley himself avers that Eden's version of the facts is not materially different from his own. After stating in his amended complaint that Eden shot at him "from his moving vehicle," Dudley now makes an unsupported attempt to argue that the vehicles had stopped by the time he was shot. This assertion is untenable, and, in any event, is not sufficiently material to raise a genuine dispute. Although none of the officers had any reason to know that Dudley was engaging in a suicide attempt—and, therefore, this Court has not factored that consideration into the reasonableness inquiry—the undisputed facts are consistent with an attempt to provoke police fire. This Court also notes that Dudley's extraordinarily high blood alcohol content is consistent with the evidence that he was driving erratically and otherwise behaving irrationally.

therefore, Eden did not violate Dudley's Fourth Amendment rights.

█ Even if Eden lacked probable cause to believe that Dudley posed a threat of serious physical harm, Eden still would be entitled to qualified immunity on this claim based on the "objective reasonableness" of his actions, "assessed in light of the legal rules that were 'clearly established' at the time." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). While Dudley's right to be free from the use of excessive force was clearly established under *Garner* and its progeny, it cannot seriously be said that a reasonable officer in Eden's position "would have known that shooting the victim was unreasonable in the circumstances." *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 903 (6th Cir.1998) (if officers of reasonable competence could disagree on the issue, then immunity should be recognized). Any mistake that Eden may have made with respect to Dudley's dangerousness was a reasonable one under the circumstances. *See id.* at 902 ("qualified immunity gives police officers 'ample room for mistaken judgments'"); *Avery v. King,* 110 F.3d 12, 14 (6th Cir.1997) (qualified immunity affords protection for reasonable mistakes).

Eden is entitled to judgment as a matter of law on the Fourth Amendment claim against him in his individual capacity. Therefore, the defendants' motion must be granted with respect to this claim, and Dudley's cross-motion for partial summary judgment must be denied.

**B. Fourth Amendment Claim against Kroczak and Lewis.** Dudley also asserts that Kroczak and Lewis used excessive force to arrest him when they threw him on the ground, placed their knees on his shoulders, and pulled his arms back to be handcuffed. The officers argue that this use of force was reasonable under the circumstances, and that they are entitled to qualified immunity on this claim.

As an initial matter, this Court notes that the excessive force claim against these two officers arises out of the Fourth Amendment's "reasonableness" requirement, and not out of the Due Process Clause. Contrary to Dudley's assertion that either constitutional source may be applicable, the Supreme Court has squarely held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham,* 490 U.S. at 395, 109 S.Ct. 1865. Indisputably, the handling and handcuffing of Dudley constituted a "seizure" within the meaning of the Fourth Amendment.

█ For purposes of qualified-immunity analysis, it is first important to note that Dudley has alleged a violation of his clearly established right to be free from the use of excessive force. This Court must then discern whether a violation of this right occurred, and, if so, "whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." *Dickerson v. McClellan,* 101 F.3d 1151, 1158 (6th Cir. 1996) (brackets in original) (citation omitted). The test of reasonableness under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. In addition, it is only reasonable to use force on a person before the person has been arrested, completely restrained, and rendered securely

under the control of the police. *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir.), *cert. denied*, 519 U.S. 821, 117 S.Ct. 78, 136 L.Ed.2d 37 (1996).

■ Based on a careful consideration of the record, this Court concludes that Lewis and Kroczak did not violate Dudley's Fourth Amendment rights. The officers were in hot pursuit of a fleeing felon. Dudley had just robbed a bank, created a dangerous situation with his vehicle, and exhibited a serious intent to evade arrest. Indeed, the facts as applied to all three of the factors in *Graham*—the severity of the crime, the threat the suspect posed to the safety of others, and his active resistance to arrest—support a finding that the officers did not violate the Fourth Amendment. When the officers pulled Dudley from the car, threw him on the ground, and handcuffed him, they did not know for certain where he had been shot. The situation was still volatile, and it was reasonable to believe that Dudley would not cooperate. The officers wanted to secure him as quickly and completely as possible, and their method for doing so was not unreasonable under the circumstances. *See Dickerson*, 101 F.3d at 1160 ("the Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances").

Even if this Court were to assume that the officers used excessive force, Kroczak and Lewis would still enjoy qualified immunity. This is so because Dudley has failed to produce sufficient evidence to indicate that the officers' conduct was objectively unreasonable under the law. *See id.* at 1158. The undisputed facts do not show that a reasonable officer would have known the seizure of Dudley amounted to a constitutional violation. *See Anderson*, 483 U.S. at 639, 107 S.Ct. 3034.

**C. Substantive Due Process Claim against Angelo.** Dudley claims that Angelo was deliberately indifferent to his

medical needs when Angelo refused to remove the handcuffs to assist the paramedic. Angelo argues that this claim is unsupported and that he is entitled to qualified immunity.

Although Dudley articulates this claim under substantive due process principles, the claim could be construed under the Fourth Amendment. The Supreme Court has explained that pursuant to *Graham*, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). And, according to the Sixth Circuit, "the seizure that occurs when a person is arrested continues throughout the time the person remains in the custody of the arresting officers." *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir.1988). Because the handcuff incident occurred while Dudley was in the custody of the arresting officers—and, indeed, occurred within minutes of the restraining of Dudley—this Court finds it appropriate to analyze the claim against Angelo under the Fourth Amendment's reasonableness requirement.

In light of the Fourth Amendment principles previously described, Angelo is entitled to qualified immunity on this claim. The initial handcuffing of Dudley was clearly constitutional,[4] and it was objectively reasonable for Angelo to refuse to unhandcuff Dudley within minutes of his apprehension. Most pointedly, Dudley has failed to show that the removal of his handcuffs was necessary for him to receive proper medical care.

■ Because the parties have also framed the argument under the rubric of substantive due process, this Court also analyzes the claim under the Due Process Clause. It is clearly established that a

4. Dudley does not argue that the handcuffing    in and of itself was an excessive use of force.

pretrial detainee, like a post-conviction prisoner, has a right to be free from "deliberate indifference" to his serious medical needs. *See Heflin v. Stewart County. Tenn.,* 958 F.2d 709, 714 (6th Cir.), *reh'g en banc denied, cert. denied,* 506 U.S. 998, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992). While a prisoner's right arises from the Eighth Amendment, the pretrial detainee's parallel right arises from the Due Process Clause. *Barber v. City of Salem. Ohio,* 953 F.2d 232, 235 (6th Cir.1992) ("while a pretrial detainee does not enjoy protection of the Eighth Amendment, the Eighth Amendment rights of prisoners are analogous to pretrial detainees' due process rights under the Fourteenth Amendment"). It is also well-established that mere negligence does not amount to deliberate indifference. *See Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Rather, deliberate indifference is only shown when an official consciously "knows of and disregards an excessive risk" to a detainee's health or safety. *Id.* at 837, 114 S.Ct. 1970. The requisite state of mind is one of subjective recklessness; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The evidence fails to show that Angelo acted with subjective recklessness. There was no reason for Angelo to believe that removal of Dudley's handcuffs was necessary to avoid a substantial risk of harm. For example, the paramedic did not indicate that Dudley would suffer additional harm if the handcuffs were not removed. Moreover, the evidence fails to establish that the failure to remove Dudley's handcuffs was a sufficiently serious deprivation of medical care. Dudley was not placed in any apparent peril, and the paramedic was able to effectively treat

Dudley by cutting away his clothing. Even if Dudley could articulate some harm, it could only be described as de minimus.

Further, it cannot seriously be said that Angelo's conduct "shocks the conscience," was malicious, or constituted an egregious abuse of executive power. Such standards are only satisfied in particularly heinous situations not at issue here. *See e.g., Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (forced pumping of suspect's stomach shocks conscience and offends due process). Nor can it be argued that the failure to promptly remove Dudley's handcuffs amounted to punishment. *See Bell v. Wolfish,* 441 U.S. 520, 536–37, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (due process requires that pretrial detainee not be punished).

In sum, whether analyzed under the Fourth or Fourteenth Amendments, Dudley has not shown that Angelo violated his constitutional rights. Angelo is entitled to qualified immunity, and summary judgment must be granted in his favor.

**D. Claims against City of Eastlake.** Dudley claims that the City of Eastlake is liable for the alleged violations of his constitutional rights.[5] Municipalities are persons within the meaning of § 1983 and may be held liable for civil rights violations. *Monell v. New York City Dept. of Social Serv.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, municipalities are not vicariously liable for the torts of their agents under a *respondeat superior* theory. *Id.* at 691, 98 S.Ct. 2018. Rather, liability under § 1983 only arises when the municipality itself causes the constitutional violation based on its policies, customs, or failure to train officers. *Id.* Therefore, for Dudley's claims against Eastlake to survive summary judg-

---

5. Dudley also sued the officers in their official capacities; such suits are an alternative way of pleading an action against the entity for which the officers are employed. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099,

87 L.Ed.2d 114 (1985). Accordingly, the claims against Eden, Kroczak, Lewis, and Angelo in their official capacities are treated as, and subsumed by, the claims against the City of Eastlake. *Id.* at 166, 105 S.Ct. 3099.

ment, Dudley must produce evidence showing (1) Eastlake maintained a relevant policy or custom, or failed to train its officers; (2) a deprivation of his constitutional rights; and (3) a causal link between the alleged deprivation and the policy, custom, or failure to train. *See City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Dudley has failed to substantiate his claims that the City of Eastlake has a policy of improperly using deadly force or otherwise fails to train its officers. As described previously with respect to the claims against the officers in their individual capacities, the undisputed facts fail to show that the officers' actions violated Dudley's rights under the United States Constitution. The City has produced its policy manual, which correctly states the law regarding the use of force, as well as training materials on the subject. The City has also submitted records indicating that Eden attended and passed courses on the use of force and firearms. This evidence stands unrebutted. Accordingly, summary judgment is granted in favor of the City of Eastlake (and the officers in their official capacities).

## IV.

Dudley's remaining claims are based upon Ohio law. Where a district court exercises original jurisdiction over a claim or claims, the court has supplemental jurisdiction over all other claims that are so related to the original claim(s) as to form part of the same case or controversy. 28 U.S.C. § 1367(a). However, the decision to exercise supplemental jurisdiction is not mandatory and the district court may decline to exercise this jurisdiction where the court has dismissed all claims over which it had original jurisdiction. *Id.* at § 1367(c)(3). Because this Court has dismissed all of Dudley's federal claims before trial, it declines to exercise jurisdiction over his remaining state law claims.

## V.

For the reasons discussed above, this Court concludes that there are no genuine issues of material fact and that the defendants are entitled to judgment on Dudley's § 1983 claims as a matter of law. This Court further declines to exercise jurisdiction over the remaining state law claims. Accordingly, the plaintiff's motion for partial summary judgment is denied, and the defendants' motion for summary judgment is granted.

This order is final and appealable.

IT IS SO ORDERED.